UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT Chattanooga

| UNITED STATES OF AMERICA | ) | |
| --- | --- | --- |
| | ) | |
| v. | ) | 1:11-cr-37 |
| | ) | |
| | ) | |
| RACHEL MATHEWS | ) | Judge Mattice/Lee |

# PLEA AGREEMENT

The United States of America, by the United States Attorney for the Eastern District of Tennessee, and the defendant, Rachel Mathews, and the defendant's attorney, Aubrey L. Harper, have agreed upon the following:

1. The defendant will plead guilty to the following counts in the indictment:

a) Count 1. Conspiracy to obstruct justice, in violation of Title 18, United States Code, Section 1512(k).

The punishment for this offense is as follows:

Count 1 (18 U.S.C. § 1512(k)):

Imprisonment for up to twenty years; supervised release for up to five years; fine of up to $250,000; any lawful restitution; and a $100 special assessment.

b) Count 2. Accessory after the fact to Hobbs Act robbery, in violation of Title 18, United States Code, Section 3.

The punishment for this offense is as follows:

Count 2 (18 U.S.C. § 3):

Imprisonment for up to ten years; supervised release for up to three years; fine of up to $250,000; any lawful restitution; and a $100 special assessment.

c) Count 3. Accessory after the fact to the using and carrying of a firearm during and in relation to a crime of violence, in violation of Title 18, United States Code, Section 3.

The punishment for this offense is as follows:

Count 3 (18 U.S.C. § 3):

Imprisonment for up to fifteen years; supervised release for up to five years; fine of up to $250,000; any lawful restitution; and a $100 special assessment.

2. In consideration of the defendant's guilty plea and cooperation, the United States agrees to move the Court at the time of sentencing to dismiss the remaining counts (4,5,6,7,12,13,14) against the defendant in this superseding indictment.

3. The defendant has read the indictment, discussed the charges and possible defenses with defense counsel, and understands the crime(s) charged. The defendant is pleading guilty because the defendant is in fact guilty. In order to be guilty, the defendant agrees that each of the following elements of the crime(s) must be proved beyond a reasonable doubt:

Count 1 (18 U.S.C. § 1512(k))

a. That two or more persons agreed commit a crime, that is, obstruct justice, as charged in the indictment ("Obstructing Justice" means to alter, destroy, mutilate, or conceal, or attempt to alter, destroy, mutilate, or conceal a record, document, or object with the intent to impair its integrity or availability for use in an official proceeding);

b. The defendant knowingly joined and participated in the conspiracy.

Counts 2,3 (18 U.S.C. § 3)

a. The crime of Hobbs Act Robbery (Ct. 2)/violation Title 18, United States Code, Section 924(c) (Ct.3) had been committed by the principal, in this case, Jesse Mathews;

2

b. The defendant knew that this crime had been committed and that Jesse Mathews had committed it;

c. The defendant thereafter intentionally received, relieved, comforted, or assisted Jesse Mathews in order to hinder and prevent that person's apprehension trial or punishment for the underlying crime.

4. In support of the defendant's guilty plea, the defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of the defendant's guilty plea. They do not necessarily constitute all of the facts in the case. Other facts may be relevant to sentencing. Both the defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

a. On January 22, 2011, Jesse Mathews ("Mathews") robbed the Carl's Jr. restaurant in Colorado Springs, CO with a firearm. At the time Mathews robbed the Carl's Jr. it was engaged in and affected interstate commerce. He brandished the firearm during this robbery.

b. On February 11, 2011, Mathews robbed the Cash America Pawn Store located in Colorado Springs, CO with a firearm. Mathews took sixteen firearms, approximately $15,000 in United States Currency, and jewelry worth approximately $40k. At the time Mathews robbed the Cash America Pawn Store it was engaged in and affected interstate commerce. He brandished the firearm during this robbery.

c. On February 14, 2011, Jesse Mathews ("Mathews") robbed the Walgreens drug store in Colorado Springs, CO with a firearm. At the time Mathews robbed the Walgreens it was engaged in and affected interstate commerce. He brandished the firearm during this robbery.

d.  At the time of the robberies, Mathews was in custody at a halfway house in Colorado Springs. Mathews was on parole for a felony conviction of robbery for which he served approximately eight years of a twenty year sentence.

e.  Shortly after the robberies, Mathews absconded from the custody of the halfway house in Colorado Springs, CO. Mathews wired money to his sister, the defendant, in order for her to buy a plane ticket to fly to meet him in Colorado so she could help him escape. The defendant flew to Colorado that day. Mathews informed the defendant he committed the robberies and that he escaped from the halfway house. The defendant, along with one of Mathews' girlfriends, then aided Mathews in evading law enforcement by moving with him from hotel room to hotel room, providing him food, etc.. The defendant bought bus tickets for her and Mathews who traveled to Nashville, TN via bus. The defendant bought the tickets under false names. James Poteete ("Poteete") picked up Mathews and the defendant from the bus station. Mathews paid Poteete $1,000 to drive him and Rachel to Asheville, NC. Poteete was, at some point, made aware of the fact that Mathews had committed the robberies in Colorado and was a fugitive from justice.

f.  In Asheville, NC they met Mathews' parents, Ray ("Ray") and Kathleen ("Kathleen") Mathews. On or about March 6, 2011, Mathews, Ray, and Kathleen were seen by a witness moving into the Microtel Hotel in Chattanooga, TN. Kathleen rented the hotel under the name "Kathleen Moore." Mathews introduced himself to a witness at the Microtel as "Kevin Moore." Kathleen and Ray also referred to their son, Mathews, as "Kevin Moore." Mathews informed Kathleen and Ray that he was a fugitive and that he had committed the robberies in Colorado Springs. While at the Microtel, the Colorado Department of Corrections ("CDOC") called Kathleen and asked if she knew where her son, Mathews, was. Kathleen told CDOC that she had not seen Mathews, but she would inform them if she did. This was at least the second time that

4

Kathleen lied to law enforcement about Mathews' whereabouts. She also lied to law enforcement in Asheville, NC all the while knowing that Mathews was a fugitive who had robbed a business that affected interstate commerce.

    g.    On or about March 16, 2011, Kathleen and Ray moved into a house in Chattanooga. Poteete drove down from his home in Antioch, TN, and he and Matthews helped move Kathleen and Ray. Poteete has since admitted to ATF that one of the items he moved was a bullet proof vest into Kathleen and Ray's house. Mathews moved in with an employee of the Microtel ("Girlfriend") who knew him as "Kevin Moore."

    h.    On or about March 27, 2011, Mathews and his Girlfriend went to the R.K. Shows gun show at the National Guard Armory in Chattanooga. Mathews spoke to someone there for about thirty minutes and then left. Mathews then called Ray and said "bring the family collection." Less than hour later Kathleen and Ray met Mathews and Girlfriend at Girlfriend's residence. Kathleen and Ray transferred between ten and twelve firearms to Mathews. At the time they gave the firearms to Mathews, they were aware he was a convicted felon. These firearms, also known as "the family collection," were some of the firearms Mathews stole in the robbery of the Pawn Shop in Colorado Springs.

    i.    Mathews and Girlfriend took the firearms back to R.K. Shows gun show at the Armory where Mathews traded three of the stolen firearms for an M-4 assault rifle. ATF and FBI have since recovered these stolen firearms (those traded for the M-4).

    j.    On or about March 28, 2011, Ray and Kathleen drove Mathews to Nashville, TN. According to Ray, they were supposed to drop Mathews off at the bus depot. Their plan was for Mathews to travel to New York, NY to acquire false identification which he would use to escape into Canada. For some reason, this plan never came to fruition.

k. On or about March 29, 2011, Mathews was back in Chattanooga. Before Mathews returned to Chattanooga he met Poteete. Poteete saw Mathews in possession of the previously mentioned M-4 in a guitar case. Mathews resumed staying at the Girlfriend's house. Kathleen and Ray were aware that Mathews was back in Chattanooga.

l. On April 2, 2011, a witness saw Mathews leaving Girlfriend's house with the previously mentioned guitar case. Mathews took Girlfriend's car. Mathews told Girlfriend that he was going to eat and then go to his parents' house. Girlfriend never saw Mathews in possession of a bullet proof vest as long as he stayed at her house. Later that morning Mathews attempted to rob the US Money Shops located at or near 5952 Brainerd Road. The Chattanooga Police Department arrived on the scene and foiled the robbery. Mathews engaged the Chattanooga Police in a gun battle in which Mathews killed Chattanooga Police Department Sergeant Tim Chapin. CPD officers subdued Mathews who was wearing a bullet proof vest. CPD recovered two firearms from Mathews. These two firearms were among those Mathews stole from the pawn shop in Colorado Springs.

m. CPD located Girlfriend's car on the scene of the robbery. Inside the car CPD found the guitar case which contained the M-4 semi-automatic assault rifle.

n. Later that day law enforcement recovered among other things two more of the stolen guns from Girlfriend's house among Mathews' things.

o. Early April 3, 2011, law enforcement searched Kathleen and Ray's house and recovered ammunition. The ammunition was in the trunk of Kathleen and Ray's car and in a drawer in the house. Kathleen explained how some of the ammunition ended up in the trunk of their car.

p. On or about April 4, 2011, the defendant and Poteete arrived at Kathleen and Ray's house. Kathleen gave the defendant and Poteete a key to a storage unit in Chattanooga and directed

6

them to go to the storage unit and get the firearms out of it. The defendant and Poteete did as they were told and took out at least six firearms. Poteete took the six firearms to his residence in Antioch, TN. Four of those firearms Mathews had stolen from the pawn shop in Colorado.

    q.    On or about April 6, 2011, the defendant called Poteete and told him to get rid of the firearms including the stolen firearms. The defendant used code to convey this message. Poteete threw the firearms away. Kathleen then called Poteete and warned him that ATF and/or FBI knew he had the firearms and were coming to retrieve them. Poteete then retrieved the firearms and wiped them down to conceal his fingerprints. ATF did recover the firearms from Poteete.

    r.    ATF and FBI have now interviewed the defendant, Kathleen, Ray, and Poteete who all confessed. All four admitted knowing that Mathews had robbed the pawn shop in Colorado as well as that he was an escapee from the halfway house. They were also aware that he robbed other businesses in Colorado. They admitted that they had this knowledge and assisted Mathews in avoiding apprehension for these robberies and for his escape. They admitted that they did they not tell law enforcement about Mathews' location and his crimes, and they also actively hid this information from law enforcement. Kathleen and Ray admitted to knowingly transferring and disposing of firearms to Mathews whom they knew was a convicted felon. Kathleen further admitted to possessing ammunition and firearms while in the Eastern District of Tennessee. All four admitted to committing these offenses in the Eastern District of Tennessee.

    s.    All of the firearms and ammunition mentioned herein did travel in and affect interstate commerce.

    t.    Many of these events occurred in the Eastern District of Tennessee.

    5.    The defendant understands that by pleading guilty the defendant is giving up several rights, including:

a) the right to plead not guilty;

b) the right to a speedy and public trial by jury;

c) the right to assistance of counsel at trial;

d) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

e) the right to confront and cross-examine witnesses against the defendant;

f) the right to testify on one's own behalf, to present evidence in opposition to the charges and to compel the attendance of witnesses; and

g) the right not to testify and to have that choice not used against the defendant.

6. The parties agree that the appropriate disposition of this case would be the following as to each count:

a) The Court may impose any lawful term(s) of imprisonment, any lawful fine(s), and any lawful term(s) of supervised release up to the statutory maximum(s);

b) The Court will impose special assessment fees as required by law; and

c) The Court may order forfeiture as applicable and restitution as appropriate. No promises have been made by any representative of the United States to the defendant as to what the sentence will be in this case. Any estimates or predictions made to the defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court, and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea(s). The defendant understands that the sentence in this case will be determined by the Court after it receives the presentence report from the United States Probation Office and any information presented by the parties. The defendant acknowledges that the sentencing determination will be based upon the entire scope of the defendant's criminal conduct, the

8

defendant's criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

7.  The defendant further agrees to cooperate fully, completely, and truthfully with any and all law enforcement agents and personnel of the United States Attorney's Office. This cooperation includes, but is not limited to, meeting with and being interviewed by such law enforcement agents or personnel of the United States Attorney's Office whenever requested. The defendant further agrees not to protect anyone who was truly involved and not to falsely implicate anyone who was not truly involved in the commission of criminal offenses. The defendant further agrees to testify completely and truthfully before a federal grand jury, at any trial, or at any other proceeding if called upon by the United States to do so. Upon request by the United States, the defendant must furnish all documents, objects and other evidence in the defendant's possession, custody, or control that are relevant to the United States' inquiries. The defendant and defense counsel also knowingly, voluntarily, and intentionally waive the defendant's right (where applicable) to have defense counsel present during the course of cooperation, including questioning or court appearances.

8.  To ensure the defendant's truthful cooperation, the United States agrees, except as provided below, not to use any self-incriminating information provided by the defendant pursuant to this written plea agreement against the defendant. However, nothing in this plea agreement shall restrict the use of any information (1) known to the United States prior to entering into this written plea agreement, (2) obtained from any other source, or (3) concerning the defendant's prior criminal record. Should any of the following occur (1) the defendant provides false or misleading information during the course of the defendant's cooperation, (2) the defendant moves to withdraw the defendant's guilty plea, or (3) the defendant breaches any other of the terms of this plea

9

agreement, then the United States may make use of any information provided by the defendant to law enforcement authorities at any time (including any information provided during formal or informal proffer sessions prior to signing this plea agreement, and any information provided after signing this plea agreement) for any purpose in any subsequent proceeding, including grand jury, trial, and sentencing phases of this case or in any other prosecutions or proceedings against the defendant or others. Moreover, if the United States determines at any time (before or after sentencing) that the defendant has failed to cooperate fully, completely, and truthfully, or otherwise violated any of the terms of this plea agreement, it will be free to withdraw any favorable sentencing motion filed by the United States, including motions filed under U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553.

9. At the time of sentencing, the United States may bring to the Court's attention the nature, extent, and value of the defendant's cooperation so that it may be considered in determining a fair and appropriate sentence under the facts of the case.

10. Given the defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of Section 3E1.1(a) of the Sentencing Guidelines. Further, if the defendant's offense level is 16 or greater, and the defendant is awarded the two-level reduction pursuant to Section 3E1.1(a), the United States agrees to move, at or before the time of sentencing, the Court to decrease the offense level by one additional level pursuant to Section 3E1.1(b) of the Sentencing Guidelines. Should the defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for the defendant's offense(s), including violations of conditions of release or the commission of additional offenses prior to sentencing, the United States will be free not to make such motion or to withdraw such motion if already made, and will be free to recommend to the Court that the defendant not

10

receive any offense level reduction for acceptance of responsibility under Section 3E1.1 of the Sentencing Guidelines.

11. The defendant agrees to pay the special assessment in this case prior to sentencing.

12. The defendant agrees that the court shall order restitution, pursuant to any applicable provision of law, for any loss caused to: (1) the victim(s) of any offense charged in this case (including dismissed counts); and (2) the victim(s) of any criminal activity that was part of the same course of conduct or common scheme or plan as the defendant's *charged* offense(s).

13. Financial Obligations. The defendant agrees to pay all fines and restitution imposed by the Court to the Clerk of Court. The defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If the defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, the defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. The defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. The defendant and counsel also agree that the defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying the defendant's counsel and outside the presence of the defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, the defendant agrees to disclose fully all assets in which the defendant has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, the defendant additionally agrees to the following specific terms and conditions:

11

a)  If so requested by the United States, the defendant will promptly submit a completed financial statement to the U.S. Attorney's Office, in a form it provides and as it directs. The defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

b)  The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on the defendant in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

c)  If so requested by the United States, the defendant will promptly execute authorizations on forms provided by the U.S. Attorney's office to permit the U.S. Attorney's Office to obtain financial and tax records of the defendant.

14. (a) In consideration of the concessions made by the United States in this agreement and as a further demonstration of the defendant's acceptance of responsibility for the offense(s) committed, the defendant agrees not to file a direct appeal of the defendant's conviction(s) or sentence except the defendant retains the right to appeal a sentence imposed above the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater) determined by the district court. The defendant also retains the right to appeal any sentence over twenty years.

(b) In addition, the defendant knowingly and voluntarily waives the right to file any motions or pleadings pursuant to 28 U.S.C. § 2255 or to collaterally attack the defendant's conviction(s) and/or resulting sentence. The parties agree that the defendant retains the right to raise, by way of collateral review under § 2255, claims of ineffective assistance of counsel or prosecutorial misconduct not known to the defendant by the time of the entry of judgment.

15. This agreement becomes effective once it is signed by the parties and is not contingent on the defendant's entry of a guilty plea. If the United States violates the terms of this

agreement, the defendant will have the right to withdraw from this agreement. If the defendant violates the terms of this agreement in any way (including but not limited to failing to enter guilty plea(s) as agreed herein, moving to withdraw guilty plea(s) after entry, or by violating any court order or any local, state or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute the defendant for any and all federal crimes that the defendant committed related to this case, including any charges that were dismissed and any other charges which the United States agreed not to pursue. The defendant expressly waives any statute of limitations defense and any constitutional or statutory speedy trial or double jeopardy defense to such a prosecution. The defendant also understands that a violation of this plea agreement by the defendant does not entitle the defendant to withdraw the defendant's guilty plea(s) in this case.

16. This plea agreement constitutes the full and complete agreement and understanding between the parties concerning the defendant's guilty plea to the above-referenced charge(s), and there are no other agreements, promises, undertakings, or understandings between the defendant and the United States. The parties understand and agree that the terms of this plea agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

WILLIAM C. KILLIAN
UNITED STATES ATTORNEY

_8/10/11_ By: _____
Date  Christopher D. Poole,
 Assistant United States Attorney

_8/10/11_ By: _____
Date  Steven S. Neff,
 for Assistant United States Attorney

_8/10/11_ _____
Date  Rachel Mathews,
 Defendant

_8/10/11_ _____
Date  Aubrey L. Harper,
 Defendant's Attorney

14